## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| DOUG DILLY, *on behalf of himself and all others similarly situated*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 2:14-mn-00001-DCN |
| vs. | ) ) | No. 2:14-cv-03307-DCN |
| PELLA CORPORATION, | ) ) | **ORDER** |
| Defendant. | ) ) ) | |

This matter is before the court on defendant Pella Corporation's ("Pella") motion for summary judgment. For the reasons set forth below, the court holds that plaintiff's claims are barred by the applicable statute of limitations and grants Pella's motion for summary judgment.

### I.  BACKGROUND

In early 2006, plaintiff Doug Dilly ("Dilly") contracted with Frye Construction ("Frye") to construct his home. Pl.'s Resp. Ex. 1, Dilly Depo. 23:2–5. In March 2006, another contractor working on the home purchased Pella windows to be installed in Dilly's home from Heartland Pella, an independent sales distributor for Pella products. Dilly Depo. 16:23–17:23. Dilly paid Heartland Pella directly for the windows. Id. at 37:15–38:4. Dilly purchased the windows subject to the following limited warranty:

> Pella warrants that the non-glass components of its Covered Pella Products, including the Pella Endura Hardware collection, shall be free of manufacturing defects in material workmanship that significantly impair their proper operation and function for ten (10) years from the date of sale by Pella or its authorized dealer. If Pella is given notice of a defect in materials or workmanship occurring within ten (10) years from the date of sale by Pella or its authorized dealer, Pella shall, at its sole option: 1) repair or

1

> replace the defective part(s) or product(s) (with cost of labor included only within two [2] years of the date of sale by Pella or its authorized dealer) or 2) refund the original purchase price.

Def.'s Mot. to Dismiss, Ex. 1.

Dilly first noticed problems with his windows in April or May 2007 when he saw water running down the walls during a rainstorm. Dilly Depo. 65:11–18; 67:10. He immediately contacted his contractor and called Pella the following day. Id. at 68:2–6. Pella inspected Dilly's windows and determined that "the screws were put in wrong at the factory" and replaced the screws on the windows. Id. at 68:14–24. Thereafter, the windows leaked during another rainstorm. Id. at 68:24–69:1. Pella again inspected the windows and determined that it was a gasket problem, thereafter replacing the gaskets. Id. at 69:3–14. The windows continued to suffer from leaking issues, and Pella again inspected the windows and determined that the replaced gaskets were the incorrect gaskets. Id. at 69:15–24. Pella replaced the gaskets for a second time. Id. at 69:19–24. Dilly contacted his insurance company, and the insurance company sent an environmental hygienist to perform testing on Dilly's windows. Id. at 69:22–24. The environmental hygienist tested the walls and tore out some of the drywall, discovering mold and wet insulation. Id. at 70:10–24. Over the course of the next two years, Dilly continued to experience problems with the windows, and Pella or third parties retained by Heartland Pella continued to inspect, test, and attempt to repair or replace the windows. Id. at 70:5–71:21. On or about August 27, 2008, Heartland Pella made its last service call to Dilly's home. Id. at 89:19–91:6. After that date, Dilly never made another service request or warranty claim relating to the windows.

In 2007 and 2008, Dilly submitted written communications to Pella or Heartland Pella, either through counsel retained on his behalf or on his own.  On October 17, 2007, Dilly's attorney Michael Mills ("Mills") sent Pella Corporation Customer Support Specialist Kendra Higginbotham ("Higginbotham") and Heartland Pella representative Kent Brewster ("Brewster") a letter regarding Dilly's water infiltration issues.  Def.'s Mot. Ex. 7.  The letter stated the following:

> Within a few months of installation, in April 2007, the Windows failed, resulting in (among other things) significant water infiltration into the Residence, property damage to the Residence and the Dilly's personal property, loss of use of the residence and other damages, costs, and expenses.  Dr. Dilly promptly notified Pella of the <u>defective nature of the Windows</u> and took reasonable and appropriate steps to prevent and mitigate further damage.  <u>Pella representatives have acknowledged that the failure of the Windows is the result of a product defect</u>, a fact confirmed by testing performed by Glazing Specialists International, LLC, the testing firm retained by Pella. . . .  Despite the attempted repairs and despite the passage of nearly six months from the time Dr. Dilly advised Pella of the failure of the Windows, the Windows continue to leak.

<u>Id.</u> (emphasis added).  Five months later, Dilly sent an e-mail to Brewster, copying his attorney, in which he stated:  "I was wondering if . . . [Pella] had been able to discuss what kind of restitution they planned on making with me for the mess, expenses and hardship of the pella windows leaking . . . ."  Def.'s Mot. Ex. 8.

Sometime before March 24, 2008, Dilly submitted a formal complaint to the State of Nebraska Office of the Attorney General.  Def.'s Mot. Ex. 9.  On April 20, 2008, after receiving a copy of Pella's response to his original complaint, Dilly sent a letter to the Office of the Attorney General.  Def.'s Mot. Ex. 4.  In the letter, Dilly stated that "[a] brief summary of the facts giving rise to this matter and my efforts over the past year . . . demonstrates that . . . Pella has not 'rectified' the defects with the windows."  <u>Id.</u>  Dilly extensively outlined the alleged defective nature of the windows and Pella or its

representatives' unsuccessful attempts to remedy the situation.  Id.  Dilly further stated that the "defective" windows rendered substantial portions of his home unlivable and damaged his property.  Id.  Further, Dilly stated that "Heartland Pella admitted that the Windows were defective and that the gaskets and sashes had failed and that the screws were put in wrong at the Pella factory."  Id.  Dilly complained that despite continued representations to the contrary, Pella had not provided "a solution and [had] not by any stretch of the imagination live up to Pella's promises to provide a high-quality, defect free product that protects our home from the elements."  Id.  In conclusion, Dilly stated that he had contacted the Attorney General's Office "in a final attempt to resolve this matter with Pella before resorting to other legal remedies."  Id. (emphasis added).

On June 20, 2008, the Office of the Attorney General sent a final letter to Dilly notifying him that the mediation efforts were not bringing the dispute to a satisfactory resolution and that it would not be taking any action against Pella under the Nebraska Consumer Protection Act.  Def.'s Mot. Ex. 11.  The Office of the Attorney General did, however, recommend that Dilly consult with an attorney.  Id. ("Our determination in this matter is not intended as an opinion on the merits of your case.  If you wish to take further action, you may consult with private legal counsel.").

In 2013, Dilly read online about a pending lawsuit against Pella involving inherently defective windows.  Dilly Depo. 113:25–114:1.  Dilly then contacted class counsel.  Id. at 114:8–10.  On July 30, 2014, Dilly filed a class action complaint against Pella in the United States District Court for the District of Nebraska, alleging jurisdiction based on diversity of citizenship.  The complaint brings the following eleven causes of action:  (1) violation of the Nebraska Uniform Deceptive Uniform Trade Practices Act

4

("NUDTPA"); (2) negligence; (3) negligent misrepresentation; (4) breach of implied warranty of merchantability; (5) breach of implied warranty of fitness for a particular purpose; (6) breach of express warranty; (7) fraudulent misrepresentation; (8) fraudulent concealment; (9) unjust enrichment; (10) violation of the Magnuson-Moss Warranty Act ("MMWA"); and (11) declaratory relief.  Dilly contends that the windows are defective in that water permeates the windows through "four common leakage paths:  (a) the glazing pocket; (b) the aluminum cladding and wood; (c) the crank hardware and fasteners; and (d) the frame to sash joint."  Compl. ¶ 11.  Dilly further alleges that Pella knew, or but for its negligence should have been aware, of the defect when it sold the windows.  Id. ¶ 19.

Pella filed a motion to dismiss on September 29, 2014.  Dilly opposed the motion on November 7, 2014, and Pella replied on December 15, 2014.  The motion has been fully briefed and is ripe for the court's review; however, the court has not yet issued an order on the motion.  Pella filed the instant motion for summary judgment on September 1, 2015.  Dilly responded on September 18, 2015, and Pella replied on September 28, 2015.  The motion has been fully briefed and is now ripe for the court's review.[1]

## II.  STANDARDS

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

---

[1]     In the motion for summary judgment, Pella asks the court to consider its motion to dismiss and motion for summary judgment simultaneously.  Further, Dilly is designated for class certification briefing, being the case randomly picked by the court. Dilly filed a motion for class certification on November 9, 2015.  Pella responded on December 15, 2015.  The court will dispose of the motion to dismiss and for summary judgment simultaneously.

Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Anderson, 477 U.S. at 255.

This case is predicated on diversity jurisdiction and was filed in federal court, so it is governed by state substantive law and federal procedural law.  Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 416 (2010) (citing Hanna v. Plumer, 380 U.S. 460, 465 (1965)).  "In multidistrict litigation, the law of the transferee

6

circuit governs questions of federal law." In re KBR, Inc., 736 F. Supp. 2d 954, 957 (D. Md. 2010) modified on reh'g sub nom. In re KBR, Inc., Burn Pit Litig., 925 F. Supp. 2d 752 (D. Md. 2013) vacated and remanded on other grounds, 744 F.3d 326 (4th Cir. 2014); see also In re Gen. Am. Life Ins. Co. Sales Practices Litig., 391 F.3d 907, 911 (8th Cir. 2004); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993); In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1176 (D.C. Cir. 1987); cf. Bradley v. United States, 161 F.3d 777, 782 n.4 (4th Cir. 1998) (applying Fourth Circuit law to questions of federal law in a case transferred from the Fifth Circuit).  Therefore, this court must apply Nebraska substantive law and Fourth Circuit procedural law.

### III.  DISCUSSION

Pella first argues that all of Dilly's claims are barred by the applicable statutes of limitations.  Def.'s Mot. 2.  Dilly contends that he first discovered the defective condition of the windows in 2013 when they were removed from his home.  Thus, under the discovery rule, Dilly claims that the applicable statute of limitations did not accrue until 2013 and that his claims are therefore timely.  Pl.'s Resp. 6–20.  Alternatively, Dilly argues that the respective statutes of limitations are tolled by the doctrines of fraudulent concealment and equitable estoppel.  Pl.'s Resp. 22–27.

#### A.    Accrual of the Respective Statute of Limitations

The court must first determine when the statute of limitations accrued for each cause of action.  The court will analyze the statute of limitations applicable to each of Dilly's claims below and will then analyze whether the various statutes of limitations are tolled by either equitable estoppel or fraudulent concealment.

### 1.    NUDTPA

Civil actions arising under the NUDTPA can be brought "only within four years from the date of the purchase of goods or services."  Neb. Rev. Stat. § 87-303.10.  Dilly purchased the windows in 2006.  Therefore, unless a tolling doctrine applies, Dilly's NUDTPA claim expired in 2010, four years before Dilly filed the present action.  As more fully set forth below, neither fraudulent concealment nor equitable estoppel tolls the statutes of limitations under these circumstances.  Therefore, the court grants Pella's motion for summary judgment as it pertains to Dilly's NUDTPA claim.

### 2.    Negligence

Under Nebraska law, a four-year statute of limitations applies to negligence claims.  Neb. Rev. Stat. § 25-207(3).  Pella argues that Dilly's negligence claim is barred by the four-year statute of limitations because it accrued in 2006.  Def.'s Mot. 14.  Dilly argues that the statute of limitations has not expired because the discovery rule applies to toll the limitations period.  Pl.'s Resp. 15–16.

 "In a negligence action, it has generally been stated that a statute of limitations begins to run as soon as the cause of action accrues, and an action in tort accrues as soon as the act or omission occurs."  Shlien v. Bd. of Regents, Univ. of Neb., 640 N.W.2d 643, 650 (Neb. 2002) (citing Berntsen v. Coopers & Lybrand, 546 N.W.2d 310 (Neb. 1996)).  However, the Nebraska Supreme Court has determined that the discovery rule applies in certain cases.  Id.  "[I]n a case where the injury is not obvious and is neither discovered nor discoverable within the limitations period running from the wrongful act or omission, the statute of limitations does not begin to run until the potential plaintiff discovers, or with reasonable diligence should have discovered, the injury."  Id.  The Supreme Court of Nebraska has stated that "[d]iscovery occurs when the party knows of facts sufficient to

8

put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of facts constituting the basis of the cause of action." Giese v. Stice, 567 N.W.2d 156, 165 (Neb. 1997) (quoting Zion Wheel Baptist Church v. Herzog, 543 N.W.2d 445, 450 (Neb. 1996)). "The discovery rule applies when an individual's injury is not obvious and the individual is wholly unaware that he or she has suffered an injury or damage." Mace-Main v. City of Omaha, 773 N.W.2d 152, 159 (Neb. Ct. App. 2009) (emphasis added).

"[T]he beneficence of the discovery rule is not bestowed on a potential plaintiff where the potential plaintiff in fact discovers, or in the exercise of reasonable diligence should have discovered, the injury within the initial period of limitations running from the wrongful act or omission." Id. "'Discovery,' in the context of statutes of limitations, does not refer to the legal right to seek redress, but to the fact that one knows of the existence of an injury." Alston v. Hormel Foods Corp., 730 N.W.2d 376, 385 (Neb. 2007). The Nebraska Supreme Court has recognized that "[a]lthough we acknowledge that we have occasionally referred to discovery being the time when a claim 'accrues,' the discovery rule, as it exists in Nebraska, is better understood as a tolling doctrine." Id. at 384–85.

Pella argues that even if the discovery rule applies, Dilly's negligence claim is barred because Dilly was aware of the defect by August 2008 at the latest. In response, Dilly argues that he "lacked information about the nature of the defect because it was not disclosed by Pella, and at each attempted repair, Pella, in its expert capacity, provided Plaintiff with a new explanation for the leaks along with a corresponding repair." Pl.'s Resp. 16.

The undisputed evidence on the record demonstrates that Dilly was fully aware of the defects in the windows by October 17, 2007. Dilly's attorney continuously uses the words "defect" and "defective" throughout the letter he sent to Pella representatives on Dilly's behalf. Def.'s Mot. Ex. 7. The letter states that the windows failed in April 2007, resulting in significant water infiltration, property damage, loss of use of the residence, and other damages, costs, and expenses. Id. The letter further states that despite Pella's attempted repairs, the windows continued to leak, and Dilly's attorney even threatened legal action. Id.

Dilly's correspondence with the Office of the Attorney General further demonstrates that he was completely mindful of the alleged defective nature of the windows and Pella's refusal to repair the defect or pay for the damage to his home. Def.'s Mot. Ex. 4. In the April 20, 2008 letter, Dilly stated that the defective windows rendered substantial portions of his home unlivable and caused damage to his property. Id. Dilly further stated that despite its continuous representations to the contrary, Pella had failed to provide a solution and had not lived up to its promises to provide a defect free product. Id. Dilly indicated that his contacting the Office of the Attorney General was his last attempt to remedy the situation before resorting to other legal remedies. Id.

Indeed, during his deposition, Dilly testified that he "started considering [filing this lawsuit] after it had gone on for many months and [he] wasn't getting answers." Dilly Depo. 96:5–13. When asked whether it would be fair to say that at the time the letter was written, Dilly knew that there was a problem with the windows, Dilly responded in the affirmative. Dilly Depo. 97:15–18. When asked whether, at the time of the October 17, 2007 letter, it was fair to say that he knew he had a potential remedy via

lawsuit, Dilly responded:  "I didn't know that.  I knew that, you know, maybe it was an option.  I don't know if it would have remedied the problem. . . . It was easier for me to put this in the back of my mind for awhile and try not to think about it."  Id. at 97:19–98:4.  Dilly further indicated that "[i]t was too stressful to think about it," id. at 111:22–23, and when asked what changed in July 2014, Dilly stated that he "recognized the opportunity and with the thought of it in July, it didn't make [him] sick to [his] stomach anymore," id. at 111:24–112:4.

Although Dilly may argue that he was unaware of the inherently defective nature of the windows until they were removed in November 2013, "[i]t is not necessary that the plaintiff have knowledge of the exact nature or source of the problem, but only knowledge that the problem existed."  Andres v. McNeil Co., 707 N.W.2d 777, 786 (Neb. 2005) (quoting Bd. of Regents v. Lueder Constr. Co., 433 N.W.2d 485, 491 (Neb. 1988)).  There is no genuine dispute of material fact that Dilly was entirely aware of facts "sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of facts constituting that basis of the cause of action" by October 17, 2007.  Giese, 567 N.W.2d at 165; see also Andres, 707 N.W.2d at 786 ("Although appellant may not have known the source of the leakage or cracks, the record reflects that within 1 year of her taking possession of the house, she was aware of the problems ultimately giving rise to this lawsuit.  We, therefore, reject appellant's discovery-related argument.").  Thus, Dilly's negligence cause of action accrued at that time and expired on October 17, 2011, almost three years prior to filing suit.[2]

_____

[2]     Even if the court were to be extremely lenient and find that Dilly was not fully aware of facts sufficient to put a person of ordinary intelligence and prudence on inquiry until his correspondence with the Office of the Attorney General in April 2008, the

Because the court holds that neither equitable estoppel nor fraudulent concealment tolls the statute of limitations, the court grants Pella's motion for summary judgment as it pertains to Dilly's negligence claim as barred by the statute of limitations.

### 3.    Negligent Misrepresentation and Fraud-based Claims

Again, Pella contends that Dilly's negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment claims fail as a matter of law because they are barred by the four-year statute of limitations.

Under Nebraska law, negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment claims must be brought within four years after the discovery of the fraud. Neb. Rev. Stat. § 25-207 ("The following actions can only be brought within four years: . . . (3) an action for an injury to the rights of the plaintiff, not arising on contract, and not hereinafter enumerated; and (4) an action for relief on the ground of fraud, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud, . . . ."); First Nat'l Bank of Osceola v. Gabel, 2003 WL 21146098, at *14 (Neb. Ct. App. May 20, 2003) (stating that the plaintiff's "final cause of action, fraudulent misrepresentation, also has a 4–year statute of limitations." (citing Neb. Rev. Stat. § 25–207 (Reissue 1995))). Although the Nebraska Supreme Court has not explicitly held that a negligent misrepresentation claim sounds in fraud for purposes of the discovery rule under § 25-207, federal courts have inferred that the Nebraska Supreme Court would take this approach, finding that cases "strongly suggest that a negligent misrepresentation claim accrues when the falsity of a representation is discovered, as opposed to when the representation is made." Creighton Univ. v. Gen.

statute of limitations would still expire in April 2012, more than two years before Dilly filed the present action.

<u>Elec. Co.</u>, 2009 WL 756206, at *10 (D. Neb. Mar. 18, 2009) (analyzing issue and collecting cases); <u>see also</u> <u>Nebraska Plastics, Inc. v. Holland Colors Am., Inc.</u>, 2003 WL 22519410, at *11 (D. Neb. Nov. 7, 2003) ("[T]he statute of limitations for negligent misrepresentation claims begins to run upon discovery of the false statement, just as it does in fraudulent misrepresentation claims.").

Pella contends that Dilly discovered the alleged defect in the windows by 2008, at the latest; therefore, Pella argues that Dilly's negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment claims expired in 2012, two years prior to bringing suit. Def.'s Mot. 15. Dilly alleges that Pella failed to disclose the defect in the windows and continued to conceal the defective nature of the windows throughout its repair attempts. Pl.'s Resp. 18.

While this discussion mirrors that of Dilly's discovery of the alleged defective nature of the windows in Dilly's negligence claim above, the analysis here is <u>slightly</u> different. The court must determine whether there is a genuine dispute of material fact as to when Dilly discovered the alleged fraudulent conduct giving rise to the claim, i.e. that Pella's representations were fraudulent and that Pella failed to disclose the defective condition of the windows. Importantly, the letter Dilly's attorney sent on his behalf on October 17, 2007 stated that "Pella representatives have acknowledged that the failure of the Windows is the result of a product defect, a fact confirmed by Glazing Specialists International, LLC, the testing firm retained by Pella." Def.'s Mot. Ex. 7. Further, in Dilly's letter to the Office of the Attorney General, he stated that "Heartland Pella admitted to me that the Windows were defective, that the gaskets and sashes had failed and that the screws were put in wrong at the Pella factory." Def.'s Mot. Ex. 4. Dilly

13

expressed his continued dissatisfaction with Pella's alleged failure to provide a permanent and lasting remedy to the water infiltration problem. Id. The allegations and the undisputed evidence demonstrate that Pella did not deny the defective condition of the windows, but rather admitted that the windows were defective. The undisputed evidence further demonstrates that Pella refused to pay for the damage because it believed its "warranty obligations have been satisfied," not because it denied the existence of a defect in the windows. Def.'s Mot. Ex. 10.

The only conceivable claim for negligent misrepresentation or fraudulent misrepresentation lies with Pella's alleged failure to disclose the inherently defective condition of the windows. However, undisputed evidence on the record demonstrates that Dilly had full knowledge of the defective nature of the windows by April 2008 at the latest and did not trust nor rely on Pella's continued representations that the windows were repaired or that the water infiltration problems were resolved. See Def.'s Mot. Ex 4 (complaining that Pella has not provided "a solution and does not by any stretch of the imagination live up to Pella's promises to provide a high-quality, defect free product that protects our home from the elements"). Because Dilly was aware of the alleged falsity of Pella's representations by April 2008, the statute of limitations began to run at that time. Dilly's counsel's empty assertions to the contrary are not supported by the evidence in the record. Neither Pella nor its representatives made any representations after the 2008 service call.

Therefore, because neither tolling doctrine applies, Dilly's negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment claims are

barred by the statute of limitations, and the court grants Pella's motion for summary

judgment as to those claims.

### 4.    Breach of Implied Warranty Claims

As with most of the other claims, the four-year statute of limitations for warranty

claims accrues when the breach occurs unless the warranty explicitly extends to future

performance.  Neb. Rev. Stat. § 2-725(2).  Implied warranties, by their very definition, do

not explicitly extend to future performance.  See Neb. Popcorn, Inc. v. Wing, 602

N.W.2d 18, 23 (Neb. 1999) ("[I]n order to meet the exception based on a warranty of

future performance, the warranty must be an express rather than an implied

warranty . . . ."); Murphy v. Spelts-Schultz Lumber Co., 481 N.W.2d 422, 430 (Neb.

1992) (stating that the "the exception applies only to an express warranty and not to an

implied warranty").  Because Dilly purchased the windows in 2006, the implied warranty

claims accrued at that time and expired four years later.  Therefore, Dilly's breach of

implied warranty claims are barred by the statute of limitations and must be dismissed.

### 5.    Breach of Express Warranty

Section 2-725 of the Nebraska Uniform Commercial Code states:

> [A]n action for breach of any contract for sale must be commenced within
> four years after the cause of action has accrued . . . A cause of action
> accrues when the breach occurs, regardless of the aggrieved party's lack of
> knowledge of the breach.  A breach of warranty occurs when the tender of
> delivery is made, except that where a warranty explicitly extends to future
> performance of the goods and discovery of the breach must await the time
> of such performance the cause of action accrues when the breach is or
> should have been discovered.

If the warranty explicitly extends to future performance, the accrual of the statute of

limitations is tolled until the breach was or should have been discovered by the plaintiff.

Controlled Env'ts Const., Inc. v. Key Indus. Refrigeration Co., 670 N.W.2d 771, 778

(Neb. 2003).  "[T]hree important guideposts" can be gleaned from Nebraska courts'
examination of the future performance exception:  "(1) a future performance warranty
must be explicit, (2) a future performance warranty must be express, and (3) a limited
warranty to repair or replace does not extend to future performance."  Id.

Recognizing that the exception should be interpreted quite narrowly, courts have
defined the word explicit as "'characterized by full clear expression:  being without
vagueness or ambiguity:  leaving nothing implied . . . unreserved and unambiguous in
expression:  speaking fully and clearly.' . . . Synonyms for explicit include 'unequivocal,'
'definite,' 'specific,' 'express,' and 'categorical.'"  Id. (quoting Murphy, 481 N.W.2d at
430).  "Thus, in order to constitute a future performance warranty, 'the terms of the
warranty must unambiguously indicate that the manufacturer is warranting the future
performance of the goods for a specified period of time.'"  Id. (quoting R.W. Murray Co.
v. Shatterproof Glass Corp., 697 F.2d 818, 823 (8th Cir. 1983)).

Further, the Supreme Court of Nebraska has held that a limited warranty to repair
or replace does not extend to future performance to toll the statute of limitations.
Nebraska Popcorn, 602 N.W.2d at 18.  "The justification is that a warranty to repair or
replace goods only 'anticipates potential defects and specifies the buyer's remedy during
the stated period' and does not 'explicitly guarantee the proper performance of goods for
some period of time into the future.'"  Controlled Env'ts, 670 N.W.2d at 779 (quoting
Nebraska Popcorn, 602 N.W.2d at 24).  However, "the mere existence of repair and
replace language will not disturb a finding that the warranty extends to future
performance."  Id.

Pella provided the following express limited warranty at the time of sale:

16

> Pella warrants that the non-glass components of its Covered Pella Products, including the Pella Endura Hardware collection, shall be free of manufacturing defects in material workmanship that significantly impair their proper operation and function for ten (10) years from the date of sale by Pella or its authorized dealer.  If Pella is given notice of a defect in materials or workmanship occurring within ten (10) years from the date of sale by Pella or its authorized dealer, Pella shall, at its sole option:  1) repair or replace the defective part(s) or product(s) (with cost of labor included within two [2] years of the date of sale by Pella or its authorized dealer) or 2) refund the original purchase price.

Def.'s Mot. to Dismiss, Ex. 1.  Pella does not cite the first sentence of the warranty above in its motion for summary judgment but rather relies solely on the second portion of the warranty.  Def.'s Mot. 19 (citing Compl. ¶ 41).

In Grand Island Exp. v. Timpte Industries, Inc., 28 F.3d 73, 75 (8th Cir. 1994), the court found the defendant's warranty that its trailers would be "'free from defects in materials and workmanship for a period of five years'" explicitly extended to future performance under Nebraska law.  Likewise, in R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 822 n. 3 (8th Cir. 1983), the court determined that a warranty extended to future performance when the seller warranted that its "'insulating glass units for a period of twenty (20) years from the date of manufacture against defects in material or workmanship . . . .'"  Similarly, in Controlled Environments, 670 N.W.2d at 778, the court found that the following warranty explicitly extended to future performance:  "Manufacturer's product is warranted to be free from defects in material and workmanship under normal use and maintenance for a period of one year from the date of original installation."  Pella warrants that the non-glass components of its windows shall be free of manufacturing defects in material workmanship that significantly impair their proper operation and function for ten years from the date of sale.  Def.'s Mot. to Dismiss

Ex. 1. The court holds that the aforementioned express limited warranty explicitly extended to future performance.[3]

Therefore, the court must now determine whether there is a genuine issue of material fact regarding when Dilly discovered, or should have discovered, that the windows were defective. See Controlled Env'ts, 670 N.W.2d at 781 ("When a warranty extends to future performance, as it does here, the statute of limitations is tolled and the cause of action does not begin to accrue until the breach of that warranty is or should have been discovered."). In analyzing when a party should have discovered a breach under 2-725(3), the Supreme Court of Nebraska has been guided by two Eighth Circuit opinions that analyzed discovery under the future performance exception. Id. at 782 (citing R.W. Murray, Co. v. Shatterproof Glass Corp., 758 F.2d 266 (8th Cir. 1985); Grand Island Exp. v. Timpte Industries, Inc., 28 F.3d 73 (8th Cir. 1994)).

In Shatterproof Glass Corp., the Eighth Circuit upheld the district court's determination that the discovery of relatively few defective glass panels did not compel a finding that the buyer should have discovered the extensive nature of the panel failures. 758 F.2d at 273. In Timpte Industries, Inc., Grand Island Express bought 52 trailers from Timpte Industries in 1984. 28 F.3d at 74. By 1986, Grand Island Express began experiencing problems with the trailers' floors, and by May 1986, Grand Island Express made its first floor repairs. Id. By June and July 1987, it was repairing 4 or 5 trailer floors a month, and by August 1987, at least 14 repairs were made on 12 trailers. Id. The

---

[3]      To the extent Dilly's breach of express warranty claim relies on any other alleged non-written express warranties, the court holds that such warranties do not explicitly extend to future performance. Therefore, the statute of limitations for claim based on non-written warranties accrued at the time of delivery, 2006, and expired four years later in 2010.

Eighth Circuit found that Grand Island Express should have discovered the breach of warranty prior to August 1987 and went on to distinguish <u>Shatterproof Glass Corp.</u> by noting that there, the plaintiffs discovered relatively few defects. <u>Id.</u> at 75. The Supreme Court of Nebraska "read these cases to stand for what seems both obvious and logical, namely, that when goods are warranted against defects, the discovery analysis should focus on the buyer's knowledge of the nature and extent of the problem(s) with the goods. It is only when a buyer discovers, or should have discovered, <u>facts sufficient to doubt the overall quality of the goods</u> that § 2-725(2) is satisfied and that the statute of limitations begins to run." <u>Controlled Env'ts</u>, 670 N.W.2d at 783.

Dilly argues that "material facts exist that call into dispute the cause and severity of the problem that [he] experienced with his windows." Pl.'s Resp. 8. In his letter to the Office of the Attorney General, Dilly states: "Permanently sealing the Windows shut is not a solution and does not by any stretch of the imagination live up to Pella's promise to provide a 'high-quality,' defect free product that protects our home from the elements." Def.'s Mot. Ex. 5. By that time, Dilly knew the extent of the damage, recognizing the "continuing water infiltration into [his] home because of the defective Pella Windows . . . " and that "substantial portions of my home were unlivable." <u>Id.</u> Further, Dilly discusses that Heartland Pella "admitted" that the windows were defective, "that the gaskets and sashes had failed and that the screws were put in wrong at the Pella factory." <u>Id.</u> While Dilly states that he "was told at such time that Pella would replace the gaskets and sashes, and Pella's agents from Heartland Pella came to [his] house to allegedly replace such components," he learned that "despite the representations made to [him] by Pella's agents[,] all the defective components were not in fact replaced at such time." <u>Id.</u>

19

Lastly, Dilly testified that he "really didn't understand the magnitude of the leaking until the drywall was out from every window and the three windows that [he] thought were leaking turned into 20 . . . when [he] could see behind the walls" in 2008.  Dilly Depo. 91:10–20.  By at least April 20, 2008, Dilly had knowledge of the nature and extent of the problems with the windows and had discovered facts sufficient to doubt their overall quality.  Therefore, the court finds that there is no genuine issue of material fact that Dilly's breach of express warranty claim accrued by April 2008 at the latest and expired four years later in 2012.

### 1.    Repair or Replace Warranty

The court must next determine if the fact that Dilly's windows are still covered by the 10-year express warranty affects the analysis above.  Pella contends that "[a]lthough the Pella Limited Warranty continues to cover Dilly's windows, and would provide coverage to the extent Dilly's windows manifested a new performance issue, there is no evidence that any such new issue has developed."  Def.'s Reply 13.  Pella further argues that even if a new problem had manifested itself, Dilly would be precluded from bringing suit for lack of pre-suit notice of breach.  Id.

In Nebraska Plastics, Inc. v. Holland Colors America, Inc., 2003 WL 22519410, at *7 (D. Neb. Nov. 7, 2003), the court examined various alleged representations to determine whether there was a genuine dispute of material fact as to whether certain express warranties extended to future performance.  The plaintiff contended that certain representations extended to future performance, including a representation that the fencing would be able to last for 20 years.  Id. at *7.  The court held that if the future performance exception did apply, the plaintiff may be able to recover damages for claims

arising out of customer complaints that were received on or after October 3, 1997, four years prior to filing suit.  Id. at *6.  However, the court stated that even if the future performance exception did apply, the complaints that were made prior to that date could not provide a basis for recovery because they fell beyond the four years allotted under § 2-725.  Id. at *6, n.8.  At that time, the fencing would still have been covered under the 20 year express warranty.  Id.  Based on the court's discussion in Nebraska Plastics, Dilly's express warranty claim for breach of the repair or replace warranty accrued in 2008 when he made the last warranty claim with respect to the windows and expired four years later in 2012.  Heartland Pella made its last attempt to repair or replace the windows in August 2008, and Dilly did not make any service or warranty requests thereafter until the day it filed suit.  Therefore, if Pella breached the repair or replace warranty at that time, the statute of limitations expired in August 2012.  Any alleged breaches which occurred prior to 2008 are barred by the statute of limitations because Dilly did not file the present action until July 2014.

### 2.     Failure of Essential Purpose

Lastly, Dilly contends that Pella breached the repair or replace warranty because the warranty failed in its essential purpose.  On the same day Dilly filed his complaint asserting a legal claim for breach of express warranty for failure of essential purpose, July 30, 2014, he made a warranty claim.  Dilly asserts that its breach of express warranty claim is timely because it was filed on the same day as the corresponding breach.  Pl.'s Resp. 14.

Pella argues that Dilly's warranty claim filed contemporaneously with the lawsuit cannot serve as a basis for his breach of express warranty claim because he failed to

provide proper notice as required under Nebraska law.  Under section 2-607(3)(a),

"[w]here a tender has been accepted . . . the buyer must within a reasonable time after he

discovers or should have discovered any breach notify the seller of breach or be barred

from any remedy [.]"  Fitl v. Strek, 690 N.W.2d 605, 608 (Neb. 2005).  "What is a

reasonable time for taking any action depends on the nature, purpose and circumstances

of such action."  Id. (quoting Neb. U.C.C. § 1-204(2) (Reissue 2001)).  The Nebraska

Supreme Court has recognized that the notice requirement serves three purposes.  Id.

First, "[i]t provides the seller with an opportunity to correct any defect, to prepare for

negotiation and litigation, and to protect itself against stale claims asserted after it is too

late for the seller to investigate them."  Id.  "Whether the notice given is satisfactory and

whether it is given within a reasonable time are generally questions of fact to be

measured by all the circumstances of the case."  Id. (quoting Cheyenne Mountain Bank v.

Whetstone Corp., 787 P.2d 210, 213 (Colo. App. 1990)).  The most important policy

behind the notice requirement "is to enable the seller 'to make efforts to cure the breach

by making adjustments or replacements in order to minimize the buyer's damages and the

seller's liability.'"  Id. (quoting Maybank v. Kresge Co., 273 S.E.2d 681, 684 (N.C.

1981)).  The second policy is to provide the seller "a reasonable opportunity to learn the

facts so that he may adequately prepare for negotiation and defend himself in a suit."  Id.

(quoting Maybank, 273 S.E.2d at 684).  Lastly, the least compelling policy purpose

supporting the notice requirement is "to provide a seller with a terminal point in time for

liability."  Id. (quoting Maybank, 273 S.E.2d at 684).

     Dilly argues that its notice is sufficient, even though provided simultaneously to

filing suit.  Jurisdictions disagree as to whether § 2-607 mandates pre-suit notice.  See In

re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 155 F. Supp. 2d 1069, 1110 (S.D. Ind. 2001), reversed in part on other grounds, 288 F.3d 1012 (7th Cir. 2002) ("Courts vary widely in their interpretations of § 2–607(3)(a). For example, some courts have held, with varying degrees of analysis, that the filing of a lawsuit can, at least in some instances, satisfy the notice of breach requirement. Other courts have reached the opposite conclusion.") (internal citations omitted).

Dilly cites a number of cases supporting its argument that notice provided at the time a lawsuit is filed is sufficient. In Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co., 537 N.E.2d 624, 638 (Ohio 1989), the court recognized that many courts have held that the filing of a complaint cannot constitute adequate notice. However, the court "decline[d] to adopt such an absolute rule, as [it] believe[d] in a proper case the filing of a civil complaint could serve as notice of breach." Id. For example, the court recognized that notice given shortly after damages occurred may be sufficient; however, the court stated that "this is not such a case, as [the plaintiff's] suit was filed a full two years after the damages were sustained." Id. Therefore, Chemtrol does not support Dilly's argument because Dilly filed his claim more than 6 years after the last service call under the warranty. Similarly, Dilly cites Hearn v. R.J. Reynolds Tobacco Co., 279 F. Supp. 2d 1096, 1116 (D. Ariz. 2003). However, the Hearn court stated "that while filing a complaint upon an opposing party (as is the case here) may constitute reasonably timely notice . . . two years constitutes unreasonably delayed notice." Id. Therefore, Hearn also does not support Dilly's claim of sufficient notice. Lastly, Dilly cites Aqualon Co. v. Mac Equip., Inc., 149 F.3d 262, 271 (4th Cir. 1998). However, the court in Aqualon held that the district court correctly dismissed the plaintiff's "contract and

warranty claims because of [plaintiff's] failure to notify [defendant] of those claims within a reasonable time after accepting tender of the valves" where the plaintiff filed its complaint three years later.  Id.  Therefore, Dilly fails to provide any supporting authority under which its notice sent contemporaneous to filing suit would be sufficient.

On the other hand, courts requiring pre-suit notice have emphasized that the purposes of section 2-607 are best satisfied when a plaintiff provides pre-litigation notice of breach.  See, e.g., Thunander v. Uponor, Inc., 887 F. Supp. 2d 850, 866 (D. Minn. 2012) (applying Indiana law);  Hepper v. Triple U Enterprises, Inc., 388 N.W.2d 525, 529 (S.D. 1986) (applying South Dakota law).  The purposes of § 2-607 are "to effect a cure, or to facilitate an effort to negotiate a settlement, or to gather and preserve evidence for possible litigation."  PEB Study Group, Uniform Commercial Code Article 2: Preliminary Report 167 (1990).  Other purposes include "prevent[ing] stale claims," Kansas City v. Keene Corp., 855 S.W.2d 360, 369 (Mo. banc 1993), and "defeat [ing] commercial bad faith," N. States Power Co. v. ITT Meyer Indus., Div. of ITT Grinnell Corp., 777 F.2d 405, 409 (8th Cir. 1985).  "Courts have observed that the spirit of these purposes, taken together, promotes the resolution of warranty issues outside of the adversarial judicial process."  Budach v. NIBCO, Inc., 2015 WL 6870145, at *4 (W.D. Mo. Nov. 6, 2015) (The giving of a summons and complaint "is hardly within the spirit of . . . the Uniform Commercial Code requirement of the giving of timely notice." (citing Kerr v. Hunter Div., 1981 WL 394232 (Va. Cir. Feb. 23, 1981))).

Favoring the decisions of courts that require pre-suit notice, the following discussion from the Western District of Missouri, within the Eighth Circuit, is instructive:

Most importantly, this position reflects the majority view.  See, e.g., 18 Williston on Contracts § 52:42 (4th ed.) ("[T]he fact that the buyer has

> filed an action seeking damages for the breach of warranty has not been regarded as tantamount to the statutory notice."). Second, the history of Section 2-607 indicates that its drafters intended the provision to require pre-suit notice. Section 2-607 is largely based on Section 49 of the Uniform Sales Act, which provided that "[i]f, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor." Uniform Sales Act § 69-449. Section 49 of the Uniform Sales Act, in turn, was interpreted by most courts to require pre-suit notice. Presumably aware of this precedent, the drafters of Section 2-607 envisioned "continu[ing] the prior basic policies with respect to acceptance of goods while making a number of minor though material changes in the interest of simplicity and commercial convenience." Commentators have read this language to indicate that Section 2-607 did not seek to displace or significantly alter Section 49.

Budach, 2015 WL 6870145, at *4 (internal citations omitted) (holding that "a plaintiff must provide some minimal pre-suit notice of breach in order to assert a warranty claim under Section 2-607(3)(a) of the U.C.C.").

The court finds the analysis outlined above to be consistent with the policy considerations underlying the notice requirement and more persuasive than Dilly's empty arguments to the contrary. Therefore, to the extent Dilly's breach of express warranty claim relies on the warranty claim it made contemporaneously with filing the present lawsuit, the court holds that it fails as a matter of law for lack of notice as required under section 2-706.

Therefore, the court grants Pella's motion for summary judgment as it pertains to Dilly's breach of express warranty claim as barred by the four-year statute of limitations. Although the express limited warranty did explicitly extend to future performance, Dilly discovered the breach by 2008 at the latest.

6.    **Magnuson-Moss Warranty Act Claim (Count X)**

Magnuson-Moss Warranty Act ("MMWA") claims are governed by whatever

limitations period applies to the underlying state law breach of warranty claims.

Highway Sales, Inc. v. Blue Bird Corp., 559 F.3d 782, 789 (8th Cir. 2009) ("The parties

agree that, because the Magnuson-Moss Warranty Act contains no statute of limitations,

plaintiffs' Magnuson-Moss claims are governed by the same limitations period as

plaintiffs' state law breach of warranty claims.").  Because the court holds that Dilly's

breach of express warranty claims are barred by the statute of limitations, the court holds

that Dilly's MMWA claims are also barred by the statute of limitations.

7.    **Unjust Enrichment**

The statute of limitations for unjust enrichment claims is four years and accrues

when the "aggrieved party has the right to institute and maintain suit."  Paltani v. Ltd. Fill

Corp., 2011 WL 2724269, at *6 (Neb. Ct. App. July 12, 2011).  In Nebraska, "the law is

clear that [the plaintiff does] not have to know the full extent of his damages in order for

his claim to accrue.  A limitation period begins to run upon the violation of a legal right,

that is, when the aggrieved party has the right to institute and maintain suit."  Id. (citing

Nuss v. Alexander, 691 N.W.2d 94 (Neb. 2005)).  "For a limitation period to begin to

run, it is not necessary that a plaintiff have knowledge of the exact nature or source of a

problem, but only that a problem exists."  Id.  "A limitation period may begin to run even

though the nature and extent of the damages are not known."  Id. (citing Reinke Mfg. Co.

v. Hayes, 590 N.W.2d 380 (1999)).

While it is not clear whether the discovery rule applies to an unjust enrichment

claim, the analysis under the standard outlined above is analogous.  As more fully set

forth above, Dilly was aware the he had the right to institute and maintain a suit by 2008 at the latest. Dilly Depo. 97:19–98:4 (When asked whether, at the time of the October 17, 2007 letter, it was fair to say that he knew he had a potential remedy via lawsuit, Dilly responded: "I didn't know that. I knew that, you know, maybe it was an option. I don't know if it would have remedied the problem. . . . It was easier for me to put this in the back of my mind for awhile and try not to think about it."). Therefore, Dilly's unjust enrichment claim expired four years later in 2012, two years prior to filing suit.

Therefore, the court grants Pella's motion for summary judgment as it pertains to Dilly's unjust enrichment claim.

### 8.    Declaratory Relief

Finally, Pella argues that the court should grant its summary judgment motion as it pertains to Dilly's claim for declaratory relief because the Declaratory Judgment Act is procedural only and does not provide a substantive cause of action. Def.'s Mot. 22–23. Pella further argues that the claim fails because it simply restates the substantive claims alleged in the complaint. Id. at 23.

The Declaratory Judgment Act states that:

> [i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C.A. § 2201. The Declaratory Judgment Act is procedural only, Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) (citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937)), and "does not create an independent cause of action." Chevron Corp. v. Naranjo, 667 F.3d 232, 244 (2d Cir. 2012). The Declaratory Judgment Act is intended to help parties resolve legal disputes before either party can seek or has

sought a coercive remedy through the courts.  10B Charles Alan Wright & Arthur A. Miller, Federal Practice and Procedure § 2751 (3d ed. 1998).  Courts have "long recognized the discretion afforded to district courts in determining whether to render declaratory relief."  Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co., 139 F.3d 419, 421–22 (4th Cir. 1998).

Further, Dilly's declaratory relief claim repeats the allegations alleged in the other substantive claims.  See Kennedy v. MI Windows & Doors, Inc., No. 2:12-cv-2305, 2013 WL 267853, at *6 (D.S.C. Jan. 24, 2013); F.D.I.C. v. OneBeacon Midwest Ins. Co., 883 F. Supp. 2d 754, 761–62 (N.D. Ill. 2012) (dismissing a declaratory relief claim that raised the same issue as a substantive legal claim already before the court); Vill. of Sugar Grove v. F.D.I.C., 2011 WL 3876935, at *9 (N.D. Ill. Sept. 1, 2011) ("We have discretion to decline to hear a declaratory judgment action and courts have exercised that discretion where a plaintiff seeks a declaratory judgment that substantially overlaps it substantive claims") (internal citations omitted); Monster Daddy LLC v. Monster Cable Prods., Inc., No. 6:10-cv-1170, 2010 WL 4853661, at *6 (D.S.C. Nov. 23, 2011) (dismissing three declaratory relief counterclaims because they "raise the same legal issues that are already before the court").

Because the court dismisses all of Dilly's other claims against Pella as barred by the statute of limitations and because Dilly's claim for declaratory relief repeats the allegations alleged in his other substantive claims, the court grants Pella's motion for summary judgment as to Dilly's declaratory judgment claim.

B.     **Tolling**

The parties argue about the application of the following two tolling doctrines to all of the statutes of limitations:  fraudulent concealment and equitable estoppel.

1.     **Fraudulent Concealment**

Dilly contends that the doctrine of fraudulent concealment acts to toll the applicable statutes of limitations.  Pl.'s Resp. 21–22.  Specifically, Dilly argues that "[r]ather than disclose the defect that affected Plaintiff's windows, Pella submitted affirmative responses to Plaintiff's inquiries stating that it believed its 'warranty obligations have been satisfied.'"  Id. at 22 (quoting Ex. 5)

The Nebraska Supreme Court has held that the "doctrine of fraudulent concealment may render a statute of limitations defense unavailable."  Andres v. McNeil Co., 707 N.W.2d 777, 786 (Neb. 2005).  The court has recognized that:

> [t]he general rule supported by the decisions in most jurisdictions is that the fraudulent concealment of a cause of action from the one to whom it belongs, by the one against whom it lies, constitutes an implied exception to the statute of limitations, postponing the commencement of the running of the statute <u>until discovery or reasonable opportunity of discovery of the fact by the owner of the cause of action</u> . . . .

Id. at 786–87 (emphasis added).  "[I]n order to successfully assert the doctrine of fraudulent concealment and thus estop the defendant from claiming a statute of limitations defense, the plaintiff must show 'the defendant has, either by deception or by a violation of a duty, concealed from the plaintiff material facts which prevent the plaintiff from discovering the [misconduct].'"  Id. at 787 (quoting Schendt v. Dewey, 568 N.W.2d 210, 213 (Neb. 1997); see also Rucker v. Ward, 67 N.W. 191, 195 (Neb. 1936) (stating that defendant cannot "avail himself of the statutes of limitation as a defense," when defendant "wrongfully conceals a material fact necessary to the accrual of a cause

of action against him, and such concealment causes the opposite party to delay the filing of suit." (quoting Liberty Nat. Bank v. Lewis, 44 P.2d 127 (Okl. 1935))).

"Under the doctrine of fraudulent concealment, the plaintiff must show that he or she exercised due diligence to discover his or her cause of action before the statute of limitations expired and that the defendant committed some affirmative act of fraudulent concealment which prevented the plaintiff from discovering his or her cause of action." Upah v. Ancona Bros. Co., 521 N.W.2d 895, 902 (Neb. 1994) disapproved of on other grounds, Welsch v. Graves, 582 N.W.2d 312 (Neb. 1998) (citing Kicken v. Valentine Production Credit Ass'n, 628 F.Supp. 1008 (D.Neb.1984) (emphasis added); see also Andres v. McNeil Co., 707 N.W.2d 777, 787 (Neb. 2005) ("We have stated that, generally, for fraudulent concealment to estop the running of the statute of limitations, the concealment must be manifested by an affirmative act or misrepresentation." (emphasis added)). Nebraska courts have further stated that "'if a plaintiff has ample time to institute his action, after the inducement for delay has ceased to operate, he cannot excuse his failure to act within the statutory time on the ground of estoppel.'" Andres, 707 N.W.2d at 787 (quoting MacMillen v. A.H. Robins Co., 348 N.W.2d 869, 871 (Neb. 1984)).

The court finds Andres v. McNeil Co, Inc., 707 N.W.2d 777 (Neb. 2005), instructive. In Andres, a homeowner brought an action against a contractor and subcontractor to recover for defective construction. Id. at 781–82. The court found that there was no dispute that the plaintiff was aware from essentially the time she took possession of the home that water leaked into the house and that the condition persisted until the roof was replaced. Id. at 786. Therefore, the court found that under the

discovery rule, the statute of limitations had expired.  Id.  However, the plaintiff argued

that the defendants should be estopped from asserting a statute of limitations defense due

to their own conduct.  Id. at 787.  The court cited conflicting authority, some of which

held that a defendant's efforts to repair a purported defect and assurances given therewith

are sufficient to estop the defendant from raising a statute of limitations defense, while

other courts hold that efforts to repair should not toll the statute of limitations.  Id. (citing

Pack & Process, Inc. v. Celotex Corp., 503 A.2d 646, 650 (Del. Super. 1985) (stating that

defendant's representation to plaintiff that repairs had been made "implicitly concealed

from the plaintiff that there may have been latent defects in the roofing material"); Rhee

v. Golden Home Builders, Inc., 617 N.W.2d 618 (Minn. App. 2000) (stating that genuine

issue of material fact existed as to whether defendant was equitably estopped from

asserting statute of limitations defense because of defendant's assurances that defect had

been repaired); cf. Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737 (2d Cir.

1979) (seller's attempt to repair did not toll statute of limitations); Tomes v. Chrysler

Corp., 377 N.E.2d 224, (Ill. App. Ct. 1978) (efforts to repair do not toll statute of

limitations)).

  However, the court found that the issue of whether or not efforts to repair or

replace with or without assurances that the defects had been repaired will toll the statute

of limitations was not dispositive.  Id. at 788.  The court found that the plaintiff asserted

that the defendants actually concealed the defective manner in which the house was

constructed, rather than merely providing assurances.  Id.  The court found that "if

established, such actual concealment would permit application of the doctrine of

fraudulent concealment, thus estopping [defendants] from invoking the statute of

limitations defense." Id.  The court held that if the defendant "fraudulently concealed

pertinent information from appellant, thereby preventing appellant, despite her efforts,

from gaining timely knowledge about allegedly defective construction of the home within

the 4-year statute of limitations set forth in § 25-223, [the defendant] may properly be

estopped from invoking the statute of limitations defense." Id.  However, the court found

that there was absolutely no evidence of affirmative acts by the other defendant.  Id.

  This case is easily distinguishable from Andres.  First and foremost, it is clear that

by August 2008 at the latest, Dilly discovered the alleged defective condition of the

windows, as more fully outlined above.  The statute of limitations would only be tolled

"until [Dilly] discovered the fraud or should have discovered it by the exercise of

reasonable diligence." Summerhill v. Terminix, Inc., 637 F.3d 877, 880–81 (8th Cir.

2011) (quoting Martin v. Arthur, 3 S.W.3d 684, 687 (1999)); see also Bruna v. Bradford

& Coenen, LLC, 2014 WL 1365109, at *6 (Neb. Ct. App. Apr. 8, 2014) ("[T]he doctrine

[of fraudulent concealment] does not apply when a plaintiff has discovered facts that

constitute the basis of a cause of action.").  Further, even if Pella made representations

that the windows were repaired and concealed the defective condition of the windows

until 2008, there is no evidence of any representations or affirmative acts of concealment

after 2008 that would toll the statute of limitations until 2014.  The evidence of any

alleged affirmative conduct by Pella or its representatives—whether or not it related to

the defective condition of the windows—all occurred in 2007 and 2008.  There was

absolutely no contact between Dilly and Pella or its representatives regarding the

windows after 2008 on which to base his fraudulent concealment claims.  Because Dilly

had "ample time to institute his action, after the inducement for delay has ceased to

32

operate, he cannot excuse his failure to act within the statutory time on the ground of estoppel." <u>Andres</u>, 707 N.W.2d at 787 (quoting <u>MacMillen v. A.H. Robins Co.</u>, 348 N.W.2d 869, 871 (Neb. 1984)).  Therefore, even if Pella or its representatives had fraudulently concealed the defective condition of the windows, the statute of limitations would still expire in 2012.

Additionally, the undisputed evidence demonstrates that Pella and its representatives continuously admitted rather than fraudulently concealed the defective condition of its windows and made numerous attempts to repair or replace the windows. <u>See</u> Def.'s Mot. Ex. 4 ("Heartland Pella admitted that the Windows were defective and that the gaskets and sashes had failed and that the screws were put in wrong at the Pella factory."); Def.'s Mot. Ex. 7 ("Pella representatives have acknowledged that the failure of the windows is the result of a product defect, a fact confirmed by testing performed by Glazing Specialists International, LLC, the testing firm retained by Pella. . . . Despite the attempted repairs and despite the passage of nearly six months from the time Dr. Dilly advised Pella of the failure of the Windows, the Windows continue to leak.").  Pella sent a company to test the windows, concluding that they were defective.  Pella admitted that the gaskets and screws were defective and provided replacements.  Further, Pella's statement that it felt that its warranty obligations were satisfied—cited by Dilly in supports of its fraudulent concealment argument—does not amount to a representation that the windows are not defective or that the water infiltration problems had been remedied, but only that its obligations to repair or replace the windows had been satisfied.

Therefore, the court holds that there is no genuine issue of material fact that the doctrine of fraudulent concealment does not toll the statute of limitations.

33

## 2.    Equitable Estoppel

Dilly also asserts that the doctrine of equitable estoppel tolls the statute of limitations.  Pl.'s Resp. 23.  Specifically, Dilly alleges that:  (1) Pella had knowledge of the defect at the time of sale but did not disclose the defect to customers; (2) Dilly lacked information about the nature of the defect; and (3) Pella offered Dilly a slew of reasons why its windows were leaking, including faulty manufacturing and faulty installation, among others.  Id.

Although the doctrine overlaps with fraudulent concealment above, "[t]he doctrine of equitable estoppel may be applied to prevent a fraudulent or inequitable result of the statute of limitations."  Schendt v. Dewey, 520 N.W.2d 541, 548 (Neb. 1994) (citing Reifschneider v. Neb. Methodist Hosp., 447 N.W.2d 622 (Neb. 1989).  Under the doctrine of equitable estoppel, "[o]ne who by deception conceals material facts and thereby prevents discovery of the wrong should not be permitted to take advantage of his or her own deceit or concealment by asserting the statute of limitations or repose."  Dewey, 520 N.W.2d at 548 (citing Muller v. Thaut, 430 N.W.2d 884, 889 (Neb.1988)). The elements of equitable estoppel are:

> [A]s to the party estopped:  (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts.  As to the other party, the elements are:  (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice.

<u>Pennfield Oil Co. v. Winstrom</u>, 720 N.W.2d 886, 902 (Neb. 2006) (citing <u>In re Estate of Bauer</u>, 700 N.W.2d 572 (Neb. 2005)).

Equitable estoppel only acts to toll the statutes of limitations until Dilly discovered the alleged defect.  See <u>Dewey</u>, 568 N.W.2d at 213 ("Constructive fraud, and accordingly, the basis for estoppel, terminates when . . . [a plaintiff] discovers information which would lead to the discovery of the [defect] through the exercise of reasonable diligence, whichever occurs first." (citing <u>Umolu v. Rosolik</u>, 666 N.E.2d 450 (Ind. App. 1996)));[4] <u>see also</u> <u>Bruna</u>, 2014 WL 1365109, at *6 ("The record does not support at least one of the elements of equitable estoppel because the [plaintiffs] did not lack knowledge and the means of knowledge of the truth of the facts in question."); <u>Alberts v. Seadore</u>, WL 33548909, at *3 (Neb. Dist. Ct. Feb. 2, 1999) ("Equitable estoppel will not toll a limitations statute when parties possess timely knowledge sufficient to place them under a duty to make inquiry and ascertain all the relevant facts.").  The undisputed evidence establishes that Dilly possessed timely knowledge sufficient to place him under a duty to make inquiry and ascertain all the relevant facts. He knew he had a basis for a legal claim by 2008 at the latest, evidenced by his own deposition testimony. See Dilly Depo. 97:19–98:4 (when asked whether, at the time of the October 17, 2007 letter, it was fair to say that he knew he had a potential remedy via lawsuit, Dilly responded:  "I didn't know that.  I knew that, you know, maybe it was an option.  I don't know if it would have remedied the problem. . . . It was easier for me to put this in the back of my mind for awhile and try not to think about it").  The court holds

---

[4]     Although the court's statement in <u>Dewey</u> related to a malpractice action, the court finds the reasoning applicable under these circumstances.

that the undisputed evidence on the record demonstrates that Dilly had sufficient knowledge to preclude application of the doctrine of equitable estoppel.

Therefore, the court holds that there is no genuine issue of material fact that equitable estoppel does not toll the statutes of limitations.

### IV.   CONCLUSION

For the reasons set forth above, the court holds that all of Dilly's claims are barred by the respective statutes of limitations and **GRANTS** Pella's motion for summary judgment.

**AND IT IS SO ORDERED**.

 

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 4, 2016**
**Charleston, South Carolina**